**SID BERK, INC., Plaintiff,**

**v.**

**UNIROYAL, INC., Defendant.**

**No. 76–1674–(AAH).**

United States District Court,
C. D. California.

Jan. 3, 1977.

Loeb & Loeb by Robert A. Holtzman (Fulton Brylawsky, J. Michael Cleary, Washington, D.C. and Gerald A. Weinstein, Encino, Cal., on the briefs), having appeared for plaintiff and Harvey E. Bumgardner, Jr., New York City.

Rutan & Tucker by Bruce R. Corbett, Santa Ana, Cal. (Garvin F. Shallenberger, Santa Ana, Cal., and Arthur, Dry & Kalish, New York City, on the briefs), having appeared for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER ON MOTION FOR A PRELIMINARY INJUNCTION— DENYING PRELIMINARY INJUNCTION

HAUK, District Judge.

Plaintiff's motion for a preliminary injunction is denied in its entirety.

Pursuant to Rule 52(a), F.R.Civ.Proc. and Rule 7(a) of the Rules of the United States District Court for the Central District of California, this Court makes the following findings of fact and conclusions of law.

### FINDINGS OF FACT

*The Parties To The Action*

1. Plaintiff, Sid Berk, Inc. ("Berk" hereinafter), a corporation of the State of California having its principal place of business in Los Angeles, California, adopted its present corporate name in or about 1967 and embarked upon the objective of selling dress quality women's high fashion shoes

exclusively to leading department stores throughout the nation.

2. According to Berk, it has sold about 500,000 pairs, or approximately 55,000 pairs per year, on the average, of the shoes in question here since this effort was begun. Berk states that the pertinent women's high fashion shoes have been sold through certain department stores and have been advertised in every one of the fifty states of this country. It has never sold golf or other athletic shoes.

3. Berk states that, except for its first year of pertinent sales, its sales have always exceeded $1,000,000 per annum, but admits that the projected retail proceeds of its sales during this era only approximated $12,000,000.

4. The officers of Berk are Sid Berk, president, Seymour Fabrick, vice-president and William Gibson, secretary-treasurer. The sole stockholders of Berk are Sid Berk and Seymour Fabrick.

5. Defendant, Uniroyal, Inc. ("Uniroyal" hereinafter) is a major American corporation (incorporated in New Jersey and having its principal place of business in Middlebury, Connecticut) which is engaged in the manufacture and sale of a wide range of diversified products including a complete line of golf products for golfers, male and female.

6. Over the years, Uniroyal has established a widely recognized position in Royal ® golf products and states that it has expended approximately $20,000,000 in the promotion of the Royal ® line of golf products.

7. Uniroyal's well-known Royal ® line of golf products (including its Royal ® Daisy women's golf shoes) has always been sold exclusively to golf pro-shops and not to department stores.

### Berk's Pertinent Trade Practices

8. On July 3, 1967, Berk adopted as a trademark a device consisting of the word "DAISY" in block capital letters with a seven petal fanciful flower design superimposed on the "A" (sometimes hereinafter "the shoe device").

9. Since 1967 and up to the present time the shoe device has appeared stamped in gold on the sock liners of approximately seventy percent of the high fashion shoes sold by Berk. The other shoes sold by Berk have borne diverse trademarks usually related to the customer involved (e. g. "MISS BERGDORF").

10. Berk's shoes bearing the shoe device are packaged in orange boxes having black lids and bearing on the lid the word "DAISY" in white block capital letters with an eight petal white and orange fanciful flower design superimposed on the "A" (hereinafter "the box device"). An eight petal white and black fanciful flower design appears on one end of the Berk box.

11. None of the shoes sold by Berk have ever borne fanciful flower designs except as part of the shoe device on the sockliner.

12. In September, 1967, Berk applied to the Patent Office for registration of the shoe device on the Principal Register.

13. In October, 1967, the Patent Office rejected Berk's application on the ground that the shoe device as applied to ladies' shoes so resembled a prior registered trademark for women's shorts, pants, blouses, skirts, coats and suits as to be likely to cause confusion, mistake or deception. The cited prior mark was a device consisting of the words "Daisy's Originals of Miami" in varying letter form with a fanciful flower design superimposed on the "D".

14. In order to persuade the Patent Office to grant registration Berk argued that:

a. the fanciful flower design of the cited prior mark had a different appearance from the fanciful flower design of Berk's shoe device;

b. the "word DAISY has been registered as a trademark for many classes of goods and has, therefore, acquired no significance in the public mind identifying it with any particular product";

c. the respective devices were used on non-competing goods;

d. the respective marks differed significantly in appearance and sound; and that

e. the respective goods of Berk and the prior registrant were sold in different stores or, at least, in different departments of the same store.

15. Apparently persuaded by these arguments, the Patent Office granted registration to Berk's shoe device (sometimes hereinafter the "registered mark") on February 27, 1968, as Registration No. 845,069. Thereafter, Berk's sock liners bore the ® symbol next to the shoe device. Evidence proffered by Berk indicates that it has continuously used the registered mark on ladies shoes in the United States since 1967. The box device having the eight petal flower design continued to be printed without an ® symbol.

16. On July 20, 1973, Berk's registered mark was accorded incontestability status by the Patent Office.

17. Berk estimates that it has spent in excess of $350,000 over the years to advertise its shoes bearing the registered mark. Virtually all of this advertising has been "cooperative advertising" wherein a customer of Berk independently prepares and runs the advertisement in local newspapers and bills Berk for a percentage of the cost (usually one-half). Provided that the advertisement makes some reference to Berk or uses the word "daisy" somewhere in its copy, Berk pays its share of the cost. For this reason, Berk asserts that the total amount spent on advertising shoes bearing the registered trademark by Berk and its customers has been about $700,000. The only media advertising other than the said newspaper advertising done by Berk has been in trade magazines directed solely to those persons connected with the shoe business.

18. The vast majority of the advertisements presented to this Court by Berk to support its position on this motion prominently identify the illustrated footwear with the name of the store and make reference to the word "daisy" in a comparatively de-emphasized manner.

### Uniroyal's Pertinent Trade Practices

19. For many years, and beginning many years prior to plaintiff's obtaining its registered mark, Uniroyal has sold complete lines of golfing equipment for men and for women. Uniroyal's golf equipment lines have included balls, clubs, bags, shoes, rainwear and umbrellas.

20. Uniroyal first registered the trademark "ROYAL" for golf products in 1921 and has used this trademark for golf products continuously ever since. The mark "ROYAL" had been identified with Uniroyal (formerly U.S. Rubber) on other lines of goods at much earlier dates.

21. To golfers, the mark "ROYAL" has always been associated with Uniroyal.

22. As in most of the industry, Uniroyal's women's line of golf equipment until recently was treated as an adjunct to the larger selling men's line. It was scattered throughout Uniroyal's golfing catalog, women's clubs being shown on the last page of men's clubs, women's shoes being shown on the last page of men's shoes, and so on with other items in the women's golf line.

23. In approximately 1970—1971, a California company called Axaline was selling a brightly colored putter called the "daisy" which was especially designed (in several different colors) to appeal to the woman golfer. Despite sales of some 25,000 putters per year, Axaline had financial difficulties and asked Uniroyal to incorporate the daisy putter into Uniroyal's women's golf line. Uniroyal agreed.

24. In the first year of selling the now ROYAL DAISY putter Uniroyal sold more women's putters than it ever had in any prior year.

25. In 1973 Uniroyal adopted a new merchandising approach with respect to its women's golf line. All Uniroyal women's golf equipment was to be color coordinated in several attractive colors intended to have feminine appeal, the entire women's golf line was gathered together in a separate part of Uniroyal's catalog, an eight petal fanciful flower design was added to each

item of the line and the entire line was named ROYAL DAISY after the commercially successful putter.

26. For its newly redesigned and repackaged women's golf line Uniroyal deliberately chose to add the word "daisy" to its famous ROYAL golf trademark because daisy, like the bright feminine colors simultaneously adopted, is a meaningful word in common use which is connotative or suggestive of femininity, lightness, freshness and delicacy. The same approach had worked well in the preceding pilot year for the ROYAL DAISY putter.

27. Uniroyal first presented its complete Royal Daisy women's golf line in its 1974 catalog which was published in September, 1973. The ROYAL DAISY golf line now includes golf balls, golf clubs, putters, golf bags, golf shoes, golf gloves, rainwear, umbrellas and jackets.

28. Uniroyal's ROYAL DAISY golf shoes each feature one or more eight petal fanciful flower design(s) on one or both shoes of a pair. On one model of ROYAL DAISY golf shoes the words "Royal ® Daisy" are stamped in gold on the sock liner of the shoe. On all other models the words "Royal ® Plus" appear instead. All models of ROYAL DAISY golf shoes are sold with tags attached on which the words "Royal ® Daisy" appear.

29. Neither the word "daisy" alone nor the word "daisy" with a fanciful flower design superimposed on any part thereof appears on any ROYAL DAISY golf shoe or any tag attached thereto.

30. The boxes for the entire ROYAL DAISY line of golf equipment all have the same decorative motif and trade identification. The box for ROYAL DAISY golf shoes is typical. It is light green in color with dark green lettering. On the top of the box there are seven white and yellow eight petal fanciful flower designs and the words "Royal ® Daisy". On one end of the box there are five white and yellow eight petal fanciful flower designs, the words "Royal ® Daisy Golf Shoes" and the "UNIROYAL" trademark.

31. Neither the word "daisy" alone nor the word "daisy" in contact with a fanciful flower design appears on the ROYAL DAISY golf shoe boxes.

32. Uniroyal estimates that it has spent approximately $20,000,000 in advertising ROYAL ® golf products of which, the records reflect, in excess of $5,000,000 was spent in the five most recent years. Uniroyal states that it has spent approximately $800,000 in the three most recent years specifically for advertising its ROYAL DAISY line of women's golf products.

33. Uniroyal's advertising for its ROYAL DAISY golf line appears primarily in vertical sports magazines having nationwide circulation (e. g. "Golf Digest"). Although some minor usages of the word daisy alone may appear in the copy of some advertisements, all of the advertisements are quite clearly and prominently directed to the promotion of ROYAL ® DAISY as a trademark for Uniroyal's women's golf line. ROYAL DAISY golf shoes have not been advertised separately. They have always been advertised together with other items of the Royal golf line.

*The Controversy Between The Parties*

34. In early 1976 Berk first learned of the existence of Uniroyal's ROYAL DAISY golf line (including women's golf shoes). The discovery was made by Mr. Gibson, Berk's secretary-treasurer who is a golfer. Mr. Gibson had received a gift subscription to a golf magazine for Christmas and noticed a ROYAL DAISY advertisement in an early 1976 issue of the magazine. Prior to this lucky accident, Berk had heard nothing of ROYAL DAISY golf shoes through its normal business activities and trade channels.

35. Berk, through its attorneys, wrote to Uniroyal demanding *inter alia,* that Uniroyal desist from use of the mark ROYAL DAISY on its women's golf shoes and from using eight petal fanciful flower designs on its women's golf shoes and shoe boxes. Uniroyal, by its attorneys, refused to comply. Further correspondence having proved

ineffective to resolve the dispute, plaintiff brought this suit on May 25, 1976.

36. The complaint herein charges Uniroyal with infringement of Berk's registered mark, seeks declaratory relief to the effect that Berk has common law trademark rights to the word "daisy" alone and to fanciful flower designs having any number of petals alone, charges Uniroyal with infringement of such common law marks and contains additional counts for false representation of quality of goods, for state unfair competition and for state trademark dilution. The complaint seeks damages and an injunction. The answer denied the material allegations of the complaint and raised numerous affirmative defenses. Uniroyal's counterclaim against Berk seeks declaratory relief, damages and an injunction. Berk has denied the material allegations of the counterclaim.

37. On July 12, 1976, Berk brought this motion for a preliminary injunction against use by Uniroyal of Berk's registered mark, the word "daisy" either alone or in combination with other words or symbols (e.g. "ROYAL DAISY"), or a fanciful multipetaled flower design either alone or in combination with other words or symbols. The use sought to be enjoined included any use connected with the advertising, promotion or sale of women's golf shoes.

38. The moving papers contend that Berk has adequately demonstrated that:
   a. Berk will probably succeed on the merits of the action;
   b. Berk will suffer irreparable harm *pendente lite* if the preliminary injunction does not issue; and
   c. the balance of the equities between the parties favors issuance of the injunction.

Uniroyal, in its answering papers on the motion, disputes each of Berk's aforementioned contentions and contends additionally that the drastic remedy of a preliminary injunction should be granted only in extraordinary circumstances not present here and that the intended effect of the relief sought by the motion is not to preserve the status quo but rather to fundamentally alter the positions of the parties.

### The Effect of The Preliminary Injunction Sought by Berk Would Be To Alter The Status of The Parties

39. Granting the relief requested by Berk would seriously disrupt an established line of goods on which defendant has spent hundreds of thousands of dollars in advertising and three years of effort developing good will. Essentially the Court would have to require Uniroyal to stop selling women's golf shoes until the names could be changed, to withdraw catalogs and advertising already in existence and to create a gap in an otherwise unified line of goods.

### Berk Has Not Established A Likelihood Of Success On The Merits

40. There is no evidence that defendant has ever used plaintiff's exact registered mark in any manner.

41. The style of writing and usage of plaintiff's registered mark and defendant's marks are entirely different; the only similarity between the two marks is that they both use the word "daisy." Defendant's trade mark includes a name for which extensive secondary meaning has been built in the golf field and which clearly identifies Uniroyal as the source of the goods.

42. The word "daisy" is a meaningful word in common usage. It is connotative and suggestive of lightness, freshness and femininity when used with products designed for women. The word "daisy" has already been diluted by its common usage. There is a Daisy Footwear, Inc. in Patterson, New Jersey. It was in business several years before plaintiff began business. Numerous other companies selling or manufacturing shoes are either named "Daisy" or sell products named "Daisy". Further, the word "daisy" has been registered numerous times for other items of women's apparel and for unrelated items. A review of business names across the country show "daisy" has been used innumerable times in all varieties of businesses, a great many of which are directed to a feminine clientele. De-

fendant itself made women's rainboots called Rainy Daisies in the late 1950s.

43. Plaintiff has not shown sufficiently that the word "daisy" has actually acquired secondary meaning in the minds of the consuming public in plaintiff's favor.

44. Fanciful flowers alone are commonly used decorations on all manner goods. They have a high frequency of usage for feminine goods because they are connotative and suggestive of femininity.

45. Plaintiff has not shown sufficiently that a fanciful flower of any nature has acquired any actual secondary meaning in the minds of the consumers in plaintiff's favor.

46. The ROYAL DAISY golf shoes of defendant do not compete with plaintiff's shoes. The usage and physical appearance of plaintiff's product and defendant's ROYAL DAISY golf shoes are extremely dissimilar. The only thing in common between plaintiff's products and defendant's ROYAL DAISY golf shoes is the fact that they are both aimed at the feet of approximately half of the adult population of the United States.

47. There is no evidence of actual confusion whatsoever between plaintiff's products and defendant's ROYAL DAISY golf shoes.

48. "Royal ®", "ROYAL DAISY" and "Royal ® Daisy" have acquired secondary meaning to consumers of golf equipment denoting defendant as the source of the respective golf products.

49. There is no evidence of bad faith of defendant in adopting ROYAL DAISY as a name for its women's golf shoes. Defendant has presented evidence, which would negate any inference of bad faith, that the name for the shoes was adopted as the extension of an existing trade usage and as part of a unified line of women's golfing equipment.

### There Has Been No Showing Of Irreparable Injury

50. There is no evidence that defendant's usage has had any effect whatsoever on plaintiff's registered mark or on its products or on its reputation whatsoever. In spite of defendant's continued usage for over three years, plaintiff learned of it entirely by accident. There has been no showing that the denial of the preliminary injunction and the continuance of the defendant's complained of practices would cause any injury to plaintiff whatsoever, much less an irreparable injury.

51. Plaintiff has suffered no monetary damages to date whatsoever.

52. Plaintiff and defendant manufacture different types of products. Plaintiff's product is a leather high fashion shoe, usually not meant for heavy usage. Defendant's product is a synthetic golf shoe specially designed to be waterproof and yet lightweight and flexible for heavy usage. The products cannot be compared in terms of quality because of their difference design and function but there has been no evidence presented which demonstrates that defendant's golf shoe is not as good quality for its purpose as plaintiff's high fashion shoe is for its purpose.

### The Balance Of Equities Favors Defendant

53. Granting plaintiff's requested relief would effectively disrupt defendant's established golfing business, require recall of substantial amounts of advertising material and products and probably put defendant out of the business of selling women's golf shoes. It would destroy a major selling point of defendant's Royal Daisy women's golf line, to wit, color coordination and common identification of the products. It would change the status quo existing for over three years. Denying plaintiff's requested relief will have no effect on plaintiff or defendant whatsoever and will preserve the existing status quo.

### CONCLUSIONS OF LAW

1. A preliminary injunction is an extraordinary and drastic remedy to be granted as an exception rather than as the rule. *State of Texas v. Seatrain Interna-*

*tional, S.A.,* 518 F.2d 175, 179 (5th Cir. 1975); *Asher v. Laird,* 154 U.S.App.D.C. 249, 475 F.2d 360, 362 (1973). It is the discretionary exercise by the court of a very far-reaching power, "never to be indulged in except in a case clearly demanding it." *Warner Bros. Pictures v. Gittone,* 110 F.2d 292, 293 (3rd Cir. 1940).

2. The existence of any debate or doubts on the record as to the merits of the claim or the power of the court to act will ordinarily bar the granting of a preliminary injunction. *Fowler v. United States,* 258 F.Supp. 638, 644 (C.D.Cal.1966).

3. The function of a preliminary injunction is to preserve the status quo pending a determination of the action on the merits, *King v. Saddleback Junior College District,* 425 F.2d 426, 427 (9th Cir. 1970), and not to alter the pre-existing status of the parties fundamentally. *Warner Bros. Pictures v. Gittone,* 110 F.2d 292, 293 (3rd Cir. 1940). The "status quo" is the last uncontested status which preceded the pending controversy. *Westinghouse Electric Corp. v. Free Sewing Mach. Co.,* 256 F.2d 806, 808 (7th Cir. 1958); *Warner Bros., supra,* at 293.

4. Because the declaratory relief sought by the motion, if granted, would fundamentally alter the status of the parties and because the injunction sought would enjoin status quo practices which have been peacefully pursued for more than three years, the provisional remedy of preliminary injunction is not appropriate in this case regardless of the movant's showing on the other factors affecting the grant of the remedy.

5. Even where a preliminary injunction, if granted, will serve the appropriate purpose of maintaining the status quo of the parties pendente lite, this drastic remedy should not be granted unless the movant has clearly carried the burden of persuasion concerning the existence and application of the four prerequisites to such relief. These are: (1) a substantial likelihood that the movant will eventually prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the party opposed; and, where a public interest is involved, (4) a showing that the injunction, if issued, would not be adverse to the public interest. *Friends of the Earth, Inc. v. Coleman,* 518 F.2d 323, 327 (9th Cir. 1975); *State of Texas v. Seatrain International, S.A.,* 518 F.2d 175, 179 (5th Cir. 1975); *Asher v. Laird,* 154 U.S. App.D.C. 249, 475 F.2d 360, 362 (1973); *Charlie's Girls, Inc. v. Revlon, Inc.,* 483 F.2d 953, 954 (2d Cir. 1973).

6. In view of the facts that there has been no clear showing on the record presently before this Court that Uniroyal has infringed or will infringe the only trademark for which the movant, Berk, has shown a clear right to protection, it cannot be said that Berk has met its burden of proving its likelihood of ultimate success on the merits.

7. Infringement and unfair competition in this area both turn on whether there is a likelihood of confusion between the defendant's mark and plaintiff's mark. *Paul Sachs Originals Co. v. Sachs,* 325 F.2d 212, 214 (9th Cir. 1963).

8. In determining whether there is a likelihood of confusion the court should consider the following factors: " 'the area of concurrent sale; the extent to which the goods are related; the extent of which the mark and the alleged infringing name are similar; the "strength" or novelty of the plaintiff's mark; evidence of bad faith or intention of the defendant in selecting and using the alleged infringing name; and, evidence of actual confusion.' " *Paul Sachs Originals Co. v. Sachs, supra,* at p. 214.

9. Since plaintiff sells exclusively to department stores and defendant sells exclusively to golf "pro" shops, there is no area of concurrent sale within the meaning of *Sachs, supra.*

10. The extent to which the relevant goods of plaintiff and defendant are related is extremely slight.

11. The similarity between the plaintiff's and defendant's marks is extremely slight.

■ 12. Although the precise registered mark of plaintiff may be strong, there is no evidence whatsoever that defendant ever used plaintiff's registered mark. If plaintiff had any rights in the word "daisy" alone, it would be a weak mark because it is a meaningful word in common usage and plaintiff's manner of usage would be so as to take advantage of the positive connotative or suggestive aspects of the word applicable to women's goods, such as lightness, freshness and femininity. *J. B. Williams Company, Inc. v. Le Conté Cosmetics, Inc.*, 523 F.2d 187, 192. (9th Cir. 1975). In the words of *Esquire, Inc. v. Esquire Slipper Manufacturing Co.*, 243 F.2d 540, 543 (1st Cir. 1957), "daisy" as applied to women's goods is "an already diluted name."

13. There is no evidence of bad faith or intent of the defendant in selecting and using the alleged infringing name.

14. There is no evidence of actual confusion.

15. There is no likelihood of confusion between plaintiff's usage of its registered mark and defendant's usage of ROYAL DAISY, the word daisy, and fanciful flower designs.

16. Plaintiff has not sustained its burden of showing that it will suffer irreparable injury if the preliminary injunction is not granted.

17. Plaintiff has not sustained its burden of showing that the equities balance in favor of granting a preliminary injunction.

■ 18. Plaintiff's registered mark being incontestable is irrelevant because there is no evidence that the registered mark was infringed and because incontestability can be used only defensively to protect a registered mark against attack and cannot be used offensively to attack an allegedly infringing mark and obtain relief in favor of the allegedly infringed mark. *Tillamook County Creamery Assn. v. Tillamook Cheese and Dairy Assn.*, 345 F.2d 158, 163 (9th Cir. 1965); *John Morrell & Co. v. Reliable Packing Co.*, 295 F.2d 314 (7th Cir. 1961).

■ 19. For a person to obtain common law rights to protect a trade name it is necessary to show that the name has acquired a secondary meaning in the minds of the purchasers in favor of that person, associating the trade name with that person. *Stork Restaurant v. Sahati*, 166 F.2d 348, 352 (9th Cir. 1948). Plaintiff has not established that it has rights of protection of the word "daisy" alone or a fanciful flower alone.

■ 20. Even if plaintiff had rights in the word "daisy" alone or the fanciful flower alone the marks and rights to protect them would be weak because "daisy" is a meaningful word in common usage and the fanciful flower is a common decoration. Further, plaintiff's manner of usage would be so as to take advantage of the positive connotative or suggestive aspects of the word "daisy" applicable to women's goods, such as lightness, freshness and femininity and the fanciful flower having similar connotations. *J. B. Williams Company, Inc. v. Le Conté Cosmetics, Inc.*, 523 F.2d 187, 192. (9th Cir. 1975). In the words of *Esquire, Inc. v. Esquire Slipper Manufacturing Co.*, 243 F.2d 540, 543 (1st Cir. 1957), "daisy" as applied to women's goods is "an already diluted name." Such a weak mark would be entitled to much less protection than would a strong mark. *J. B. Williams Company, Inc., supra*, at p. 192; *Esquire, Inc., supra*, at p. 543. Thus, even if plaintiff had any rights in the word "daisy" or the fanciful flower decoration alone, its protectability would be limited to "high fashion" shoes sold to department stores.

21. Plaintiff is not entitled to a preliminary injunction. However, all of the aforesaid findings of fact, conclusions of law and order are made without prejudice to any of the parties in finally determining the issues herein on the merits.