In re BLACKWELDER FURNITURE COMPANY, INC. of Statesville, N.C., and its subsidiaries, Debtor.

BLACKWELDER FURNITURE COMPANY, INC., of Statesville, North Carolina, Plaintiff,

v.

DREXEL-HERITAGE FURNISHINGS, INC.; Brandt Cabinet Works, Inc.; Brown Jordan Company; Baker, Knapp and Tubbs, Inc.; Selig Manufacturing Company, Inc.; Henredon Furniture Industries, Inc.; Harden Furniture, Inc.; Henkel-Harris Company, Inc.; Hooker Furniture Company; Kling, a division of Ethan Allen, Inc.; Knob Creek, Inc.; Marimont Furniture, Inc.; Mastercraft, Inc.; General Mills, Inc., d/b/a Pennsylvania House; Thayer-Coggin Company; Woodmark, Inc.; and Birmingham Ornamental Iron Company, Inc., d/b/a Meadowcraft Casual Furniture, Defendants.

Bankruptcy No. St-B-79-00119.
Adv. Proceeding No. ADV-80-0172.

United States Bankruptcy Court,
W. D. North Carolina,
Statesville Division.

Oct. 7, 1980.

Richard M. Mitchell, Charlotte, N.C., for debtor.

Ross J. Smyth, Charlotte, N.C., for Drexel–Heritage.

Samuel C. Strite, Hagerstown, Md., for Brandt.

James C. Frenzel, Winston–Salem, N. C., for Brown–Jordan.

George J. Miller, Charlotte, N. C., for Baker Furniture and Mastercraft.

Howard E. Manning, Jr., Raleigh, N. C., for Selig and Meadowcraft.

William F. Maready, Winston–Salem, N. C., for Henredon Furniture and Marimont Furniture and Schoonbeck.

Irvin W. Hankins, III, Charlotte, N. C., for Harden.

James Guterman, Charlotte, N. C., for Henkel–Harris.

Wayne W. Martin, Morganton, N. C., for Kling and Knob Creek.

C. Richard Rayburn, Charlotte, N. C. and Howrey & Simon, Washington, D. C., for General Mills, d/b/a Pennsylvania House.

William K. Davis, Winston–Salem, N. C., for Woodmark.

## MEMORANDUM OF DECISION ON PLAINTIFF'S REQUEST FOR PRELIMINARY INJUNCTION

MARVIN R. WOOTEN, Bankruptcy Judge.

On September 3, 1980, the plaintiff, Blackwelder Furniture Company, Inc. (hereinafter "Blackwelder") filed an adversary complaint in this Court wherein it sought permanent injunctive relief against eighteen (18) of its suppliers.

Blackwelder is one of the largest furniture retailers in the southeastern United States. It has several showrooms in the area and also promotes nationwide sales through a printed catalogue. Blackwelder filed a petition under Chapter 11 of the Bankruptcy Code on December 7, 1979.

The complaint as filed also sought temporary injunctive relief against the defendants pending the outcome of the trial on the merits. In response to Blackwelder's request for immediate injunctive relief, the Court issued an Order setting September 22, 1980, as the date for a hearing on a preliminary injunction, and also notifying the parties that the Court would hear only oral argument on the hearing date and that all other matters should be in the form of affidavits and briefs. Said preliminary injunction is the subject of this Memorandum of Decision.

Also on September 3, 1980, Blackwelder filed a motion for a temporary restraining order (TRO) against the defendant Henredon Furniture Industries, Inc. (Blackwelder's major supplier) because Henredon had notified Blackwelder that it (Henredon) would not accept any orders from Blackwelder after September 5, 1980. In response to this motion, the Court issued a TRO against Henredon on September 5, 1980, and extended it to September 22, 1980, at which time the Court was scheduled to consider a preliminary injunction against Henredon as well as the other defendants.

The hearing on preliminary injunction was held, as scheduled, on September 22, 1980, at the Federal Courthouse in Statesville, North Carolina. Blackwelder was represented by Richard M. Mitchell. Appearing with the plaintiff's attorney was Nelson M. Casstevens, representing International Trading and Investment Company, the majority stockholder of Blackwelder and the entity which provided funding for Blackwelder's Chapter 11 plan. Appearances were made on behalf of the defendants as follows: Ross J. Smyth representing Drexel–Heritage Furnishings, Inc.; James C. Frenzel representing Brown Jordan Company; George J. Miller representing Baker, Knapp and Tubbs, Inc., and its division, Mastercraft; Howard E. Manning, Jr. representing Selig Manufacturing Company, Inc. and Birmingham Ornamental Iron Company, Inc., d/b/a Meadowcraft Casual Furniture; W. F. Maready representing Henredon Furniture Industries, Inc., and its subsidiaries Marimont Furniture, Inc. and Schoonbeck Company, Inc.; Irvin W. Hankins, III representing Harden Furniture, Inc.; James H. Guterman representing

Henkel–Harris Company, Inc.; Wayne W. Martin representing Kling, a division of Ethan Allen, Inc., and Knob Creek, Inc.; and C. Richard Rayburn representing General Mills, Inc., d/b/a Pennsylvania House. No personal appearances were made on behalf of Brandt Cabinet Works, Inc., Hooker Furniture Company, Thayer–Coggin Company, and Woodmark, Inc.; however, representatives of Hooker and Thayer–Coggin contacted Blackwelder's attorney about settlements, and filings were made on behalf of Brandt and Woodmark. All attorneys present made oral argument to the Court, and the Court has heard the arguments, read the briefs and affidavits, and has considered all of the same along with the record of Blackwelder's Chapter 11 case in deciding whether or not to issue a preliminary injunction in this proceeding.

### I. Background

A knowledge of the background facts of Blackwelder's Chapter 11 case will aid in developing a clearer understanding of the facts giving rise to this adversary proceeding. The record in said case is voluminous; however, this memorandum will recite only those facts that the Court considers important to the instant decision.

Blackwelder filed its petition under Chapter 11 of the Bankruptcy Code on December 7, 1979. At the time of said filing, Blackwelder was in serious financial difficulty, being greatly indebted to its suppliers (including the defendants herein) and being indebted to approximately four thousand (4,000) customers who had given Blackwelder deposits for furniture ordered, which orders Blackwelder was unable to fill at the time it filed its petition. Soon after the filing of the Chapter 11 petition the Court appointed a creditors' committee composed of (1) Henredon Furniture Industries, Inc., (2) Gilliam Furniture, Inc., (3) Dixie Bedding Company d/b/a Serta Mattress Company, (4) Thomasville Furniture, Inc., (5) The Lane Company, Inc., (6) Century Furniture Company, (7) American of Martinsville, and (8) Hickory Manufacturing Company, Inc., all of which are furniture manufacturers who supply furniture to Black-welder. Drexel Heritage Furnishings, Inc., one of Blackwelder's largest creditors, declined to serve on the creditors' committee. Upon the request of said creditors' committee, the Court authorized the employment of two law firms to represent the committee in the Chapter 11 proceedings–Keziah, Gates and Samet of High Point, North Carolina, and Marcus and Angel of New York, New York. Additionally, the Court authorized the employment of an accountant to serve the needs of the creditors' committee.

Almost immediately after filing its Chapter 11 petition, Blackwelder began to seek potential investors and to solicit offers from them. The creditors' committee, as a whole and through its attorneys, also sought investors to "buy into" Blackwelder. In January, 1980, after considering several potential investors and their offers, the attention of Blackwelder and the creditors' committee focused on the offer of International Trading and Investment Company, which was then and is now solely owned by Mr. Omar Bakir.

After much discussion and negotiation by and between Blackwelder, the creditors' committee, and Mr. Bakir, a plan of reorganization satisfactory to those parties was produced and filed in this Court. The disclosure statement filed with the plan was approved by the Court. The approved disclosure statement and the plan, along with ballots for accepting or rejecting said plan, were circulated to impaired creditors. The plan was accepted by the requisite number of creditors holding the required amount of claims, and the matter was placed on the Court's calendar for confirmation. Several objections to confirmation were filed by creditors, and the same were heard by the Court after notice to the proper parties. The plan of arrangement was confirmed by the Court on April 17, 1980. Said plan as confirmed provided, inter alia, that the customers who had deposited money in connection with the purchase of furniture from Blackwelder would receive the furniture ordered or a satisfactory substitute, or would receive a refund of the amount deposited, and that unsecured trade creditors (the

class which included all the defendants in this matter, with the possible exception of Henkel–Harris) would receive a payment equal to 24.8% of the claim of each creditor. The plan further provided that any trade creditor who had shipped goods to Black-welder during the 10 days immediately prior to the filing of the Chapter 11 petition would receive an additional payment equal to 25% of the amount of such creditor's claim attributable to such goods. The funding for said payments and for payments to manufacturers for furniture ordered by customers with deposits was to be provided by International Trading and Investment Company, which would receive Blackwelder stock and promissory notes in exchange for amounts advanced.

After withdrawal of a notice of appeal of the Order of Confirmation, the disbursing agent proceeded to pay the amounts due to trade creditors under the plan. Blackwelder also proceeded to make arrangements for filling the orders of customers who had placed deposits with their orders. During this period Blackwelder experienced difficulty with some manufacturers who refused to fill orders on any basis, cash or otherwise. To aid Blackwelder in reestablishing supply relationships with the reluctant manufacturers, the secretary of the creditors' committee, several members of said committee, and counsel for said committee contacted and negotiated with the recalcitrant manufacturers. The ad hoc group began its work during the early stages of formulation of the plan, and continued said work until the summer months of 1980, with the most activity occurring immediately after confirmation of the plan in April. Obviously, Blackwelder was also attempting to make satisfactory arrangements for these manufacturers to begin filling Black-welder orders again, especially the customer orders that had been received by Black-welder prior to the filing of its Chapter 11 petition. As a result of the above–described activity, some manufacturers re–established business relationships with Black-welder; however, some agreed only to fill pre–petition orders and no others.

The situation for Blackwelder was worsening as more and more of its suppliers terminated their business relationships with Blackwelder. The knockout blows, however, did not come until August 6 and August 8, 1980, at which times Henredon and Drexel–Heritage, respectively, informed Blackwelder that it was their intention to terminate all business relationships with Blackwelder—Henredon on September 5, 1980, and Drexel–Heritage on February 1, 1981. Henredon, with its divisions, is Blackwelder's largest supplier of furniture. Drexel–Heritage is Blackwelder's single largest supplier. These two manufacturers, combined with the other defendants in this matter, have in past years supplied sixty percent (60%) of the furniture sold by Blackwelder. It is not seriously controverted that such a drastic reduction in supply would have a devastating effect on Blackwelder as a major furniture retailer.

In response to the actions of the defendants herein, Blackwelder on September 3, 1980 filed the instant action. Between confirmation of the plan on April 17, 1980, and said filing date, International Trading and Investment Company had, pursuant to the confirmed plan of arrangement, invested approximately three million, two hundred fifty thousand dollars ($3,250,000) in the reorganized debtor.

## II. Jurisdiction

Several of the defendants have raised the question of this Court's jurisdiction to hear and decide the issues in this case, and have accordingly moved for dismissal for lack of jurisdiction. The Court heard arguments on this point at the September 22, 1980 hearing, and has considered the same along with the jurisdictional arguments found in the defendants' briefs. After careful consideration of the arguments and the law, the Court is of the opinion that it has jurisdiction to hear and determine all the issues raised by the pleadings in this case. The Court is also of the opinion that jurisdiction can properly be based on either of two independent grounds.

First, the language of 28 U.S.C. § 1471, as amended by the Bankruptcy Re-

form Act of 1978, is clear and unequivocal. That statute, in subsection (b), confers on the district courts "original but not exclusive jurisdiction of all civil proceedings arising under title 11 or arising in or related to cases under title 11." Subsection (c) provides that "the bankruptcy court for the district in which a case under title 11 is commenced shall exercise all of the jurisdiction conferred ... on the district courts." Given the clear language of the statute, and the irrefutable fact that this matter is a civil proceeding, the only question remaining is whether or not this matter is related to Blackwelder's Chapter 11 case. This Court concludes that it is so related. The very heart of Blackwelder's complaint is that the defendants acted as they did because Blackwelder availed itself of the provisions of Chapter 11 of the Bankruptcy Code. The allegation is that this cause of action would not exist but for the fact that Blackwelder filed in Bankruptcy. The cause of action involves completion of a plan of reorganization formulated while the bankruptcy case was pending and which was approved and confirmed by the Bankruptcy Court. Finally, the cause of action which raises the question of whether or not a group of creditors who filed claims and shared in the distribution under the plan or reorganization can destroy the investment of an entity which invested $3.25 million in the debtor pursuant to a plan of reorganization bearing the stamp of approval of a bankruptcy court and of a majority of the debtor's creditors (and in this case, some of the defendants who now seek to terminate business relationships with the debtor also helped formulate the plan and voted to approve same). The jurisdiction granted by Section 1471 then is without doubt broad enough to encompass a case which is related to a case under Chapter 11 as described above.

▮ A second basis for this Court's jurisdiction over this case is found in the plan itself–the Court retained jurisdiction "for the following purposes: (1) until the purchase orders in the Class II category (i. e., pre–petition customers with deposits) have been completed or satisfied; ..." The in-

tent of this provision is that the Court shall retain jurisdiction until the described purchase orders are filled. No party can seriously contend that all such orders have been filed (although there are statements by several manufacturers that they have filled all such orders submitted to them); thus the Court retains jurisdiction. The position of several of the defendants is that although jurisdiction was retained, as retained it is not broad enough to include the instant action. This Court disagrees. Jurisdiction was retained *until* the Class II orders were filled--a condition which has not been met. The jurisdiction so retained is the Court's full jurisdiction as granted by Section 1471– the word "until" limits the duration of the Court's jurisdiction, not its scope.

▮ At least one defendant argued that the Court lacked personal jurisdiction over it because it had no offices or manufacturing facilities in North Carolina. This Court is of the opinion that the volume of business done with North Carolina companies and the fact that the objecting defendant has sent numerous salesmen and representatives to North Carolina provides more than adequate grounds for jurisdiction. Additionally, it would appear that this defendant's argument should be directed toward venue and not toward jurisdiction. The grant of jurisdiction in Section 1471 of title 28 does not depend on jurisdiction under state law--the jurisdiction granted by Section 1471 is nationwide as to parties, if grounds for jurisdiction (i. e., "arising under title 11 or arising in or related to cases under title 11") otherwise are present. Assuming jurisdiction over the objecting defendant, which is a valid assumption in this case, the question of venue is controlled by 28 U.S.C. § 1473(d) which provides: "A trustee (and hence the debtor in possession– see 11 U.S.C. 1107) may commence a proceeding arising under title 11 based on a claim arising after the commencement of such case from the operation of the business of the debtor only in the bankruptcy court for the district where a State of Federal court sits in which, under applicable nonbankruptcy provisions, an action on such

claim may have been brought." It is beyond doubt that, given jurisdiction, a Federal court in North Carolina could entertain venue of a controversy involving a defendant having contacts with the State of North Carolina as described above, and which puts products into the stream of commerce in North Carolina to the same extent as each of the defendants in this case.

■ Another defendant, Selig Manufacturing Company, Inc., moved to dismiss on the ground that jurisdiction of the controversy between it and Blackwelder rested solely in the United States District Court for the Western District of North Carolina. The basis for their argument is a Final Consent Judgment entered into in an action entitled *Blackwelder Furniture Company of Statesville, Inc. v. Selig Manufacturing Company, Inc.*, St–C–76–34. In that action, Blackwelder (the same as the plaintiff herein) in 1976 filed suit against Selig (the same as the defendant herein), which suit involved Selig's duty to supply and sell furniture to Blackwelder upon just and reasonable terms. The action was terminated by a Final Consent Judgment entered into on May 23, 1977, which said judgment did and does continue to govern the business relationship between the parties thereto. Selig argues, in its motion to dismiss filed in this Court, that by virtue of said judgment the United States District Court has subject matter jurisdiction as to the business relationship between Blackwelder and Selig. This Court agrees. However, without expressly doing so, Selig seems to be arguing that the District Court has *exclusive* jurisdiction over the matter in controversy. With that argument this Court does not agree. Where, as in this matter, the controversy surrounding the business relationship of the parties to the Final Consent Judgment spawns a case related to a case under title 11 (see discussion above), the Bankruptcy Court and the District Court have concurrent jurisdiction as to said business relationship. The plaintiff has chosen one of two forums in which it could have sued Selig on the alleged cause of action– the Bankruptcy Court.

■ Having jurisdiction and proper venue being laid, the Court finds no reason to abstain from hearing the plaintiff's claims against Selig. Not to hear said claims would require severance of the claims from the suit as filed, would increase costs and time involved, and would result in multiple litigation. The Court cannot find that such an abstention and severance would be in the interests of justice. Selig's motion to dismiss for lack of subject matter jurisdiction is accordingly denied.

### III. Plaintiff's Cause of Action

The cause of action alleged by Blackwelder in its complaint against the defendants herein is unique and is one of first impression in this Court. Blackwelder claims that the defendants should be permanently enjoined from terminating their business relationships with Blackwelder because of the actions of said defendants in allegedly illegally refusing to ship furniture to Blackwelder. Blackwelder claims and alleges that the defendants have refused to deal with it because of its filing under Chapter 11 of the Bankruptcy Code, and that said refusals on said grounds are illegal and unlawful. It urges this Court to find that the defendants have unlawfully discriminated against the debtor (Blackwelder) and that they have therefore violated the letter and spirit of the Bankruptcy Code and should be enjoined, pursuant to and by authority of section 105 of the Code (11 U.S.C. § 105), from further violation. The gravity of the questions presented by Blackwelder's claims will be considered elsewhere in this memorandum in connection with the standard applied to determine the issuance or denial of the requested preliminary injunction.

As will be explained hereinafter, for purposes of this memorandum concerning the requested preliminary injunction, it is not necessary to consider the merits of Blackwelder's claims except insofar as required by the appropriate law concerning a request for preliminary injunction.

Most of the named defendants have filed answers to Blackwelder's complaint. Hard-

en Furniture, Inc. has been granted an extension of time in which to file answer. Representatives of Hooker Furniture Company and Thayer–Coggin Company have contacted Blackwelder's attorney and the claims against these two companies have been tentatively settled–this memorandum and order will in no way affect them or prejudice any rights or claims they may have against Blackwelder, and will in no way prejudice any rights or claims Blackwelder may have against them. Woodmark Originals, Inc., by and through its attorney, made a late filing of an affidavit and motion to dismiss, both of which were received and considered by the Court.

The answers that have been filed, without exception, deny that there existed any conspiracy or combination among the defendants to terminate the supply of furniture to Blackwelder and therefore force it out of business. Each answer also affirmatively stated that the decision to terminate made by the answering defendant was made independently and was based on valid and legitimate business considerations, not on a desire for revenge or a desire to punish Blackwelder for filing under Chapter 11.

### IV. Standard to be Applied

When addressing the question of a preliminary injunction pending trial on the merits, as in this case, the Court has a task quite different from the question of issuance of a permanent injunction. The information available to the Court at this point in the proceedings is limited in quantity and quality, and the consideration to be given to the information varies greatly from the consideration to be given to the evidence at a trial on the merits.

The standard to be applied by this Court when considering issuance of a preliminary injunction is found in the opinion of the Fourth Circuit Court of Appeals rendered in the case of *Blackwelder Furniture Company of Statesville, Inc. v. Seilig (sic) Manufacturing Company, Inc.*, 550 F.2d 189 (4th Cir. 1977), a case involving the plaintiff herein and one of the defendants herein. See also *North Carolina State Ports Authority v. Dart Containerline Company Limited*, 592 F.2d 749 (4th Cir. 1979). In the former case, Blackwelder alleged that Selig had violated Section 1 of the Sherman Act by combining to fix prices, rig retail territories, and oust a discounter from the competitive market. Blackwelder, under Rule 65(a) of the Federal Rules of Civil Procedure, sought a preliminary injunction from the United States District Court for the Western District of North Carolina. The District Court applied the standards found in *Airport Commission of Forsyth County, N. C. v. Civil Aeronautics Board*, 296 F.2d 95 (4th Cir. 1961) and *First Citizens Bank & Trust Co. v. Camp*, 432 F.2d 481 (4th Cir. 1970), and denied the preliminary injunction. The standard in those cases raised four questions:

(1) Has the petitioner made a *strong showing* that it is likely to prevail upon the merits?

(2) Has the petitioner shown that without such relief it will suffer irreparable injury?

(3) Would the issuance of the injunction substantially harm other interested parties?

(4) Wherein lies the public interest?

*Airport Commission of Forsyth County, N. C. v. CAB*, 296 F.2d at 96. The District Court found that Blackwelder had failed to satisfy the first requirement and that relief should therefore be denied. On appeal, the Court of Appeals held that the District Court's reliance on those two cases was misplaced, as the standards set forth therein applied to the issuance *vel non* of an appellate stay pending review of a trial court decision on the merits of a controversy. The Court held that the correct standard for a trial court to use in deciding whether or not to issue a preliminary injunction pending trial on the merits was the standard declared in *Sinclair Refining Co. v. Midland Oil Co.*, 55 F.2d 42 (4th Cir. 1932), to wit, the balance–of–hardship test. Using that standard, the Court directed that "the first step in a Rule 65(a) situation is for the court to balance the 'likelihood' of irreparable harm to the plaintiff against the 'likelihood' of harm to the defendant;

and if a decided imbalance of hardship should appear in plaintiff's favor, then the likelihood–of–success test (found in *Airport Commission of Forsyth County v. CAB, supra*) is displaced by . . . the test of whether or not the plaintiff 'has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation.' " [1] *Blackwelder v. Selig*, 550 F.2d at 195. However, the likelihood–of–success test (from *Airport Commission*) would apply if irreparable harm to the plaintiff is only "possible" and not likely. Thus whether or not the plaintiff must show likelihood–of–success depends upon the outcome of the balance–of–hardship test as applied to the plaintiff and defendant–much harm to the plaintiff and little to the defendant will require the plaintiff to satisfy only the "grave or serious question" requirement; the mere possibility of harm to the plaintiff and the equal possibility of harm to the defendant will require the plaintiff to satisfy the likelihood–of–success test. The Court of Appeals further held that although a trial court can properly consider the four factors enumerated in *Airport Commission of Forsyth County* when considering the issuance *vel non* of a preliminary injunction, the relative emphasis to be given those factors is determined by the balance–of–hardship test: "The two more important factors are those of probable irreparable injury to plaintiff without a decree and of likely harm to the defendant with a decree. If that balance is struck in favor of plaintiff, it is enough that grave or serious questions are presented; and plaintiff need not show a likelihood of success. Always, of course, the public interest should be considered." 550 F.2d at 196.

Following the reasoning of *Blackwelder v. Selig*, the first task for this Court is to balance the likelihood of irreparable harm to the plaintiff against the likelihood of harm to the defendants.

■ Many of the named defendants have argued that they supply only a very small part of the total amount of furniture ordered by Blackwelder from its suppliers. From that premise, each argues that its decision to terminate business dealings with Blackwelder cannot cause irreparable harm. If only one supplier were involved, that would be a valid conclusion. However, this proceeding involves a number of suppliers, which, considered together, supply approximately sixty percent (60%) of the furniture ordered by Blackwelder. (The 60% figure is based on Blackwelder's gross sales for 1979.) When considering the issue of irreparable harm to the plaintiff, in the context of this proceeding, the Court must consider said issue from the plaintiff's standpoint, not from the standpoint of each individual defendant. Viewed from the plaintiff's position, the cumulative harm that would result from the actions of the defendants, absent a preliminary injunction, would be incalculable and irreparable. To suddenly terminate 60% of its source of supply would probably be disastrous for almost any business. To terminate 60% of a furniture retailer's source of supply would certainly be disastrous. Blackwelder, a high–end furniture retailer, attracts many customers because they can buy many styles of furniture made by many manufacturers from one showroom or from one catalogue. To remove the defendants herein from Blackwelder's list of suppliers would mean that many of its customers, unable to get all the different pieces of furniture they desire from various manufacturers, would buy nothing from Blackwelder. This conclusion is strongly supported by the fact that Blackwelder's three largest suppliers are defendants herein. It appears that many people shop at Blackwelder because of those three suppliers. They make major purchases of furniture manufactured by those suppliers and then minor purchases of furniture manufactured by other suppliers. Without the defendants, Blackwelder would lose these and other customers. In fact, without the defendants as suppliers it would be very probable that Blackwelder's

1. The formulation of this "grave or serious question" test was first put forth by Judge

Jerome Frank in *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d 738 (2d Cir. 1953).

Chapter 11 reorganization plan would fail, that it would cease doing business, and that it would be liquidated—all to the detriment of Blackwelder, its customers, its employees and its suppliers.

Many of the defendants also argue that Blackwelder could buy comparable furniture from other suppliers. Viewed in objective terms of fabric, type of wood, etc., that may be a true statement. In the context of this proceeding, however, there are two flaws in the reasoning supporting that statement. First, and very important, much furniture, although similar to other items, is sold because of the reputation of the manufacturer. For example, a particular style of chair upholstered with a particular fabric may be available from several manufacturers whose finished product is very similar; however, a Henredon chair can be obtained only from Henredon. If a customer goes to Blackwelder seeking a Henredon chair, he or she will most likely not be satisfied with a similar chair manufactured by XYZ Company. Secondly, the question arises as to where the process would end if the "comparable supplier" reasoning were adopted. The furniture industry, although it has many separate manufacturers, has many of the characteristics of an oligopolistic industry, especially if the distinct "lines" of furniture (e. g., Early American) are considered. There is a finite and rather limited number of manufacturers which produce Early American furniture. Each manufacturer, if it desired to terminate dealings with Blackwelder and were allowed to rely on the "comparable supplier" reasoning, could "pass the buck" to other suppliers; however, the logical extension of that reasoning would mean that *no* supplier of Early American furniture would deal with Blackwelder. In other words, comparable suppliers might be available, but they would be of no help if they too decided not to deal with Blackwelder. Thus, because of the two flaws pointed out above, the "comparable supplier" argument is illusory. The fact remains that the actions of *these* defendants, as named in the complaint, will cause irreparable harm to Blackwelder if a preliminary injunction is not issued.

Finally, some of the defendants argue that they have not shipped furniture to Blackwelder for several months and that Blackwelder thus cannot suffer irreparable harm therefrom because their refusals to deal up to this point have not resulted in Blackwelder's demise. That argument does not impress this Court. Blackwelder was under a duty, pursuant to its plan of reorganization, to fill all pre-petition customer orders. It would naturally be reluctant to file lawsuits against uncooperative suppliers for fear that such actions might alienate other suppliers and further jeopardize the plan. Additionally, as discussed elsewhere herein, the harm caused by only one or two small suppliers' refusals to deal might not have been irreparable. However, the cumulative effect of the rising tide of refusals to deal reached a point, sometime in late August of 1980, at which it threatened Blackwelder's ability to continue its business. At that point, Blackwelder decided that its only course of action was to seek judicial intervention because the harm to it caused by the defendants, besides being irreparable, had become fatal.

If the preliminary injunction is not issued, the harm to the plaintiff will be immediate, irreparable, incalculable, and most likely, fatal; but, the inquiry does not end with a finding of irreparable harm to the plaintiff.

The next step in the procedure directed by *Blackwelder v. Selig, supra,* is consideration of the harm to the defendants if a preliminary injunction does issue. This Court finds that if the dealings between Blackwelder and the defendants are put on a cash basis, it is almost inconceivable that the defendants could suffer harm from being required to do business with Blackwelder. The defendants have without question *been* harmed by Blackwelder in that they did not receive full payment for their pre-petition claims; however, the amounts they did receive were paid pursuant to a plan of reorganization approved by a majority of creditors as required by the Bankruptcy Code. Thus the harm done by less than full

payment on claims has been done, and will not be increased or lessened by issuance of a preliminary injunction in this proceeding. Of course, it would be quite incorrect to say that there could be no possible harm to the defendants if a preliminary injunction is issued; however, the Court finds that any possible harm to the defendants would be *de minimis* when compared to the certain, irreparable harm to the plaintiff if a preliminary injunction is not issued.

■ Thus when the Court weighs the probability of irreparable harm to Blackwelder if an injunction is not issued against the likely harm to the defendants if an injunction is issued, it is compelled to find that the probability of irreparable injury to the plaintiff is great, that the likelihood of harm to the defendants is slight or non-existent, and that the balance is greatly in the plaintiff's favor. Having so found, the next question to be addressed is whether or not the plaintiff's action arises grave or serious questions that are fair ground for litigation and that deserve more deliberate investigation. *Blackwelder v. Selig*, 550 F.2d at 196.

■ The questions presented by Blackwelder's pleadings are unique and novel to this Court. The cause of action put forward does not directly rely on the Sherman Act, the Clayton Act, or any other specific antitrust law. Instead, the plaintiff contends that the actions of the defendants are unlawful and illegal in that they discriminate against the plaintiff because it took advantage of the provisions of Chapter 11 of Title 11 of the United States Code. The plaintiff contends that such actions are unlawful and illegal because they frustrate the purposes of the Bankruptcy Code. The plaintiff contends that such actions are unlawful and illegal because many of the creditors who helped formulate and voted for the plaintiff's plan of reorganization are now attempting to frustrate that plan and drive the plaintiff out of business. For the reasons explained hereinbelow, the Court finds that the plaintiff "has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make

them fair ground for litigation and thus for more deliberate investigation." *Blackwelder v. Selig*, 550 F.2d at 195, quoting from *Hamilton Watch Co. v. Benrus Watch Co.*, 206 F.2d at 740, 743.

First, the uniformity of action by the defendants raises a serious question. Although different reasons were given for their actions, the one crucial action taken by all defendants was termination of their business relationship with Blackwelder–i. e., a refusal to deal. Such uniformity of action, within a short period of time (see below), by several defendants, raises the question of conscious parallelism. To paraphrase Mr. Justice Lurton, "an act harmless when done by one may become a public wrong when done by many acting in unison, for it then takes on the appearance of a conspiracy." See *Grenade Lumber Company v. State of Mississippi*, 217 U.S. 433, 30 S.Ct. 535, 54 L.Ed. 826 (1910). All of the defendants denied any knowledge of actions to terminate Blackwelder taken by the other defendants. Those statements may be true; however, the facts presented to the Court raise grave doubts about their accuracy. For example, Henredon and Drexel are two of the largest, if not the two largest, industries in Morganton, North Carolina. They are competitors in many respects, but they also cooperate in many instances when such cooperation will benefit furniture manufacturers as a whole. Henredon and Drexel sent letters confirming their final decisions on termination of business with Blackwelder within two days of each other. The timing could certainly be coincidence, but it at least deserves further investigation. Another example is the fact that many of the defendants are members of the Furniture Manufacturers Credit Association (FMCA), an organization that disseminates much information to its members. Wallace Taylor, an officer of FMCA served as secretary of the creditors' committee and was aware, as early as February, 1980, that Blackwelder was having problems with manufacturers' refusals to deal. As a final example, the representative and agent of Henredon served as chairman of the credi-

tors' committee. That committee was aware, almost from its inception, that Blackwelder was faced with refusals to deal from several manufacturers. In fact, one of the first problems addressed by the committee and its counsel was the failure of certain manufacturers to continue dealing with Blackwelder. Yet, in his sworn affidavit, William E. Smith, President of Henredon Furniture Industries, Inc., states: "We have simply not been aware of what any other manufacturer might do with respect to Blackwelder and our decision has been based solely upon our own business judgment." Affidavit of William E. Smith, filed September 17, 1980, at page 7. Additionally, the representative of Henredon who served as chairman of the creditors' committee resigned that position, effective immediately, in a letter dated July 31, 1980, some nine days before Henredon sent its termination letter to Blackwelder.

This Court is aware that the plaintiff has not alleged an actual conspiracy by the defendants. It is also aware that the United States Supreme Court, in *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.*, 346 U.S. 537, 74 S.Ct. 257, 88 L.Ed. 273 (1954), made it clear that proof of parallel business behavior by itself does not conclusively establish an agreement constituting a Sherman Act offense. The Supreme Court, in that case, had before it the plaintiff's request to overturn a jury verdict acquitting the defendant of any anti–trust violations. The question before this Court on a motion for preliminary injunction is greatly different. *Theatre Enterprises* may be important at the trial on the merits of this matter, but at this point in the proceeding the Court concludes that the plaintiff's cause of action is not precluded by the holding in that case.

Another important aspect of this case is the time span within which the defendants decided to refuse to deal with Blackwelder. A critical meeting between Blackwelder and many of its creditors occurred on December 5, 1979 (two days before Blackwelder filed under Chapter 11). Between that date and August 15, 1980, seventeen (17) of Blackwelder's suppliers, including six key suppliers, decided to no longer deal with Blackwelder. Given the facts of the case, there certainly seems to be a grave and serious question as to whether or not the manufacturers' refusals to deal were based on Blackwelder's filing under Chapter 11 or on other, independent reasons.

Another consideration is the effect on commerce of the actions of these defendants. The effect on commerce, to wit, reduced competition among furniture retailers and the elimination of a major business entity, would appear to be the type of effect proscribed by the Sherman Act. Although no Sherman Act violation is alleged, the question of whether or not a group of creditors can discriminate against a Chapter 11 debtor where the effect of that discrimination is to reduce competition is a serious and grave question. Likewise, the question of whether or not the letter or the policy of the Bankruptcy Code prohibits such discriminatory treatment is a serious and grave question. The Court concludes that both questions are fairly raised by the plaintiff's pleadings.

A final part of the *Blackwelder v. Selig* test requires consideration of the public interest. Without elaborating, the Court notes that several factors would favor the plaintiff's position: (1) protection of Blackwelder's customers, (2) protection of Blackwelder's other creditors, (3) protection of entities which invest in Chapter 11 debtors, and (4) protection of entities which choose to take advantage of the bankruptcy laws.

In conclusion, having followed the directions and applied the standards found in *Blackwelder v. Selig* and *N. C. State Ports Authority v. Dart*, the Court can reach only one conclusion–a preliminary injunction should issue against the defendants herein pending a trial on the merits of the controversy.

The specific provisions of said preliminary injunction will now be discussed. First, the preliminary injunction is aimed at maintaining the status quo pending a full trial on the merits. The question in this matter then becomes "the status quo as of

what point in time?" Because of Blackwelder's efforts to reach agreement with its uncooperative suppliers, and because of its reluctance to take legal action while trying to fill customers' pre–petition orders, the Court concludes that the preliminary injunction should maintain the status quo *ante litem motam.* There are several decisions of Courts of Appeal and many decisions of District Courts holding that, in cases such as this where the defendants have already taken the action sought to be enjoined, the status quo which it is the function of a preliminary injunction to preserve is the last uncontested status which preceded the pending controversy. See, e. g., *District 50, United Mine Workers of America v. International Union, United Mine Workers of America,* 412 F.2d 165 (D.C.Cir. 1969); *Westinghouse Electric Corp. v. Free Sewing Machine Co.,* 256 F.2d 806 (7th Cir. 1958); *Sid Berk, Inc. v. Uniroyal, Inc.,* 425 F.Supp. 22 (D.C.Cal.1977); *Garshman v. Pennsylvania State University,* 395 F.Supp. 912 (D.C.Pa.1975). The reasoning in those cases is that if the defendants' action prior to the injunction were allowed to stand the irreparable harm to the plaintiff would occur. In this case, if the actions of the defendants taken during the period of controversy prior to issuance of this injunction are allowed to stand, there will be no need for a trial on the merits–the plaintiff would most likely cease to exist as a viable business entity before a trial could be had. Therefore, in order to preserve the plaintiff's cause of action (and in all likelihood, the plaintiff itself) it is necessary that the status quo as of a date prior to the pending controversy be maintained. Because the critical course of the plaintiff's actions was decided at the December 5, 1979 meeting between the plaintiff and many of its creditors (including many of the defendants herein), the Court concludes that the preliminary injunction issued herein should maintain the status quo as of December 4, 1979, except as specifically modified herein.

Another necessary provision of the preliminary injunction against the defendants requires that business dealings between the plaintiff and the defendants be on a cash basis. As stated heretofore in this memorandum, the Court's specific finding that the defendants will suffer little or no harm if an injunction issues is based on the assumption that the parties to this suit will be required to deal with each other on a cash basis. As the Court has decided to issue a preliminary injunction, it now becomes necessary to set forth the payment terms by which the parties to the injunction must abide.

For specially ordered upholstered goods, Blackwelder will be required to pay the manufacturer before the manufacturing process begins. This category of goods includes all items which are produced only after an order is received and which are covered with a particular fabric chosen by the customer. Said category can include both customer orders submitted by Blackwelder and stock orders submitted by it. When a manufacturer is ready to produce a specially ordered upholstered item it must notify Blackwelder, which must then forward to the manufacturer cash or a cash equivalent for the full invoice price of the item. The manufacturer must then proceed to produce the item without undue delay. Except as provided herein, a manufacturer shall not delay production of orders submitted by Blackwelder and shall not otherwise unreasonably discriminate against Blackwelder's orders. The intent of this provision is that, as far as possible, the parties shall operate on a normal business basis.

For items in manufacturers' inventories, and those items known as case goods, Blackwelder will be required to pay the manufacturer cash before shipment. Under this provision, a manufacturer must notify Blackwelder when it is ready to ship a particular item. Blackwelder must then forward to the manufacturer cash or a cash equivalent for the full invoice price of the item. The manufacturer must then proceed to ship the item without undue delay. Except as provided herein, a manufacturer shall not delay shipment of orders submitted by Blackwelder and shall not other-

wise unreasonably discriminate against Blackwelder's orders. The intent of this provision is that, as far as possible, the parties shall operate on a normal business basis.

Nothing in these provisions shall prevent the parties or any of them from implementing other payment terms that are agreeable and satisfactory to the parties thereto. Any such agreement shall control the relationship between the parties unless and until modified by the parties or by order of this Court.

Now specifically, pursuant to 11 U.S.C. § 105, a preliminary injunction, the provisions of which are detailed hereinabove, shall and does hereby issue against all defendants named herein (except Woodmark Originals, Inc., Hooker Furniture Company, and Thayer–Coggin Company) requiring them to cease and desist from refusing to deal with Blackwelder and further requiring them to deal with Blackwelder according to the business relationship that existed between them on December 4, 1979, except as modified herein. The payment terms between the parties shall be cash, as hereinabove explained, or other terms satisfactory to the parties. Said preliminary injunction shall remain in force and effect pending further order of this Court. IT IS SO ORDERED.

IT IS FURTHER ORDERED that this decision shall not affect the rights or claims against the defendants Hooker Furniture Company and Thayer–Coggin Company, pending further order of this Court. The two defendants excepted hereby have, pursuant to the plaintiff's request, been granted a continuance of the matters against them.

■ AND IT IS FURTHER ORDERED that this decision shall not enjoin Woodmark Originals, Inc. Woodmark, on November 15, 1979, communicated to Blackwelder its decision to terminate its business relationship with Blackwelder. That communication occurred prior to the plaintiff's decision to seek the protection afforded by Chapter 11, and prior to December 4, 1979; therefore, the action taken by Woodmark was outside the time limits established by this Order.